UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NDEMBO NIANGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. |
| | ) | |
| RICHARD WOLFE, Acting Secretary of | ) | 3:20-CV-0146-G |
| Department of Homeland Security, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the Plaintiff's Emergency Motion for a Temporary Restraining Order ("TRO") (docket entry 3) filed by the plaintiff Ndembo Nianga on the morning of January 21, 2020. By his motion, the plaintiff seeks an order enjoining the United States Department of Homeland Security, United States Immigration and Customs Enforcement, from removing him to his native country of Angola, where he fears he will be persecuted. *Id.* at 1. For the reasons set forth below, the court concludes that it lacks jurisdiction to adjudicate Nianga's claims and must therefore **DENY** the motion for a TRO, and **DISMISS** this case for lack of subject-matter jurisdiction.

### I. BACKGROUND

The plaintiff alleges the following:

Ndembo Nianga is 51 years old and a native and citizen of the Republic of Angola. Plaintiff's Habeas Petition, Complaint, and Request for Temporary Restraining Order/Injunctive Relief ("Complaint") (docket entry 2) at 13. Nianga and his family are members of the CASA-CE political party, which opposes Angola's ruling MPLA party. *Id.* Nianga and members of his family have been accosted by Angolan government agents due to their political affiliation on various occasions. For example, government agents attacked Nianga's stepson and broke his arm because of his political activities. *Id.* at 13-14. In June of 2016, Angolan military and police officers attacked Nianga's wife, Antonio, and the couples' children in their home. *Id.* at 14. Antonio was arrested and jailed for three months, during which time she was beaten and interrogated regarding her involvement with "government business." *Id.* Antonio eventually escaped and fled to the United States with her two youngest children in October of 2016. *Id.*

In 2017, police officers came to Nianga's home looking for Antonio. *Id.* at 15. The police informed Nianga that they would arrest and detain him until his wife and children came back. *Id.* The police said they were arresting Nianga because his family participated in government protest marches, and because Nianga was a member of the same political group: CASA-CE. *Id.* at 14-15. Nianga managed to evade arrest that day, and continued to evade arrest until he left Angola on February 9, 2019 with the intent to seek asylum in the United States. *Id.* at 15.

He first traveled to Brazil, and then traveled through various South and Central American countries until arriving in Mexico, and finally, at the Mexico-United States border. *Id.* Nianga presented himself at the U.S. border and requested asylum in or around April of 2019, but was refused entry. *Id.* at 16. He again sought entry on September 15, 2019, and this time was allowed to enter credible fear proceedings to determine whether he would have the opportunity to file a I-589 Application for Asylum. *Id.* at 16. Nianga's credible fear interview took place on October 10, 2019. *Id.* The interview was conducted in the Brazilian dialect of Portugese, and Nianga speaks an Angolan dialect of Portugese. *Id.* Nianga alleges that he was not represented by counsel at his interview, that he did not fully understand the asylum officer's questions, and that his answers were not correctly translated. *Id.*

The asylum officer found Nianga's testimony regarding his fear of persecution in Angola credible, but concluded that Nianga was subject to a bar to asylum and withholding of removal under 8 C.F.R. § 208.13(c)(4) ("the (c)(4) bar"), as he had traveled through Mexico without first applying for asylum there. *Id.* at 16-17. Nianga appealed the asylum officer's decision to Immigration Court, and appeared before an immigration judge ("IJ") for a credible fear review hearing on November 4, 2019. *Id.* at 17. During the hearing, which lasted less than seventeen minutes, Nianga relayed to the IJ the reasons that he feared persecution in Angola; some of

which he had previously stated to the asylum officer in his credible fear interview, others of which he had not. *Id.* at 17-18. When asked why he had not shared these additional facts with the asylum officer, "Nianga explained that the asylum officer did not listen to him well." *Id.* at 18. Nianga alleges that the IJ did not ask any questions relating to facts that are relevant to whether Nianga was subject to the (c)(4) bar. *Id.* At the close of the brief hearing, the IJ "agree[d] with the asylum officer's analysis" and affirmed the asylum officer's decision. *Id.*

In his complaint Nianga asserts the following six claims: (1) that 8 C.F.R. § 208.13(c)(4) ("the (c)(4) bar") violates the Due Process Clause of the Fifth Amendment; (2) that the (c)(4) bar violates several provisions of the Immigration and Nationality Act ("INA") and the Administrative Procedures Act ("APA"); (3) that the (c)(4) bar violates the notice and opportunity for comment requirements under §§ 533 (b) and (c) of the APA; (4) that the (c)(4) bar violates the APA becuase it is arbitrary and capricious; (5) that the (c)(4) bar does not apply to Nianga because he was subjected to an unlawful metering policy,[1] and; (6) that the asylum officer's credibility determination and the IJ's review thereof violated the APA because they

---

[1] The complaint defines "metering" as a process whereby, "instead of inspecting and processing asylum seekers when they presented themselves at ports of entry, as the law requires, [Customs and Border Patrol] officials would block asylum seekers—and only asylum seekers—from crossing" the border into the United States, and instead require asylum seekers to place their names on a list maintained in Mexico and then wait for weeks or months. Complaint at 20.

were arbitrary and capricious.  Complaint at 21-25.  Nianga seeks a TRO enjoining the Government from removing him from the United States until he is afforded a full and fair opportunity to have his asylum claim heard.  *See* TRO at 1.

The plaintiff filed his complaint and TRO on January 21, 2020, and filed a supplemental brief addressing this court's jurisdiction to adjudicate the plaintiff's claims on January 24, 2020.  Plaintiff's Supplemental Brief Addressing Jurisdiction ("Supplemental Brief") (docket entry 7).  On the same day, the Government filed a response to the motion for a TRO in which the Government also addresses the arguments raised in the plaintiff's supplemental brief.  Defendant's Response to Plaintiff's Motion for Temporarty Restraining Order ("Response") (docket entry 8).  According to the Government, the plaintiff's "removal is now scheduled to occur no earlier than January 28, 2020." *Id.* at 2 (page references to the Government's Response brief refer to the page numbers at the bottom of the page).  The plaintiff's motion is now ripe for review.

## II.  ANALYSIS

### A.  Legal Standard for Temporary Restraining Orders

To obtain a temporary restraining order ("TRO"), a plaintiff must show the following: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that the plaintiff will suffer irreparable injury if injunctive relief is denied; (3) the threatened injury outweighs any damage that the TRO might cause

the defendant; and (4) granting the TRO will not disserve the public interest. *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999). The decision to grant or deny injunctive relief is left to the sound discretion of the district court. *Mississippi Power & Light Company v. United Gas Pipe Line Company*, 760 F.2d 618, 621 (5th Cir. 1985). Such relief is an extraordinary remedy which should only be granted if the movant has clearly carried his burden of persuasion on each of the four factors. *Id.*; *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (citations omitted).

B. Application

Before turning to Nianga's request for a TRO, the court must determine whether it has the authority to exercise jurisdiction over Nianga's claims. Federal courts are courts of limited jurisdiction and must therefore "affirmatively ascertain subject-matter jurisdiction before adjudicating a suit." *Rodrigues v. McAleenan*, No. 3:20-CV-0139-B, 2020 WL 363041, at *3 (N.D. Tex. Jan. 22, 2020) (Boyle, J.) (quoting *Sawyer v. Wright*, 471 F. App'x 260, 260 (5th Cir. 2012) (per curiam)). A party seeking a TRO can not establish a "substantial likelihood of success on the merits" of his claim if the court concludes that it lacks jurisdiction to adjudicate the claim altogether. *See id.* As the party seeking relief, Nianga bears the burden of establishing subject-matter jurisdiction. See *Sawyer*, 471 F. App'x at 260.

The Government asserts, and the court agrees, that the court lacks jurisdiction to adjudicate the plaintiff's claims due to the jurisdiction-stripping provisions of 8 U.S.C. § 1252.

1. *Title 8 U.S.C. § 1252 Strips the Court of Jurisdiction over the Plaintiff's Claims*

The plaintiff is subject to an order of expedited removal under 8 U.S.C. § 1225(b)(1). Response at 1; Appendix to Defendants' Response to Plaintiff's Motion for Temporary Restraining Order ("Appendix") (docket entry 9) at App. 001, 012. It is undisputed that a federal district court's jurisdiction to review a determination made under Section 1225(b)(1) is circumscribed. *See* Supplemental Brief at 10. "[Section] 1252(a)(2)(A) strips courts of jurisdiction to review claims relating to the expedited removal statute except as provided in § 1252(e), '[n]otwithstanding any other provision of law (statutory or nonstatutory).'" *Rodrigues*, 2020 WL 363041, at *4 (quoting 8 U.S.C. § 1252(a)(2)(A)). Subsection (e) provides that where, as here, a plaintiff seeks "[j]udicial review of any determination made under section 1225(b)(1)[,]" such review "is available in habeas corpus proceedings, but shall be limited to" cases in which the plaintiff asserts a claim of mistaken identity, or asserts a claim that he was previously granted permanent resident status, refugee status, or asylum. *See* 8 U.S.C. § 1252(e)(2)(A)-(C); see also *Shah v. Director, Jackson Parish Correct[i]onal Center*, No. 3:19-CV-1164, 2019 WL 4254139, at *2 (W.D. La. Sept. 6, 2019) (quoting *Solis-de Patino v. Pitts*, 823 F.

Supp. 2d 457, 459 (W.D. Tex. 2011)) ("[A] reviewing court may determine whether a removal order [under § 1225(b)(1)] 'was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually admissible or entitled to any relief from removal.'"). Thus, where a plaintiff seeks review of a determination made under § 1225(b)(1) but "does not raise one of the grounds for review permitted by § 1252(e)(2), the [district] [c]ourt has no jurisdiction to consider his claims." *Rodrigues*, 2020 WL 363041, at *4 (quoting *Shah*, 2019 WL 4254139, at *2).

In his complaint, the plaintiff asserts that the court may exercise jurisdiction over his claims on several bases. Complaint at 5 (asserting that the court may exercise jurisdiction pursuant to 28 U.S.C. § 1331, the APA (5 U.S.C. § 701), the INA, 28 U.S.C. § 2241, and the Suspension Clause of the United States Constitution (U.S. Const. art. I, § 9, cl. 2)). The plaintiff also asserts that he "is not seeking to have this [c]ourt declare that he is entitled to asylum or grant him legal status," nor declare that the plaintiff is "entitled to any relief from removal." TRO at 1. Rather, the plaintiff requests that the court "order that the government provide [the plaintiff] with the full and fair opportunity to be heard that is required" by law. *Id.*

The plaintiff raises legitimate concerns about the adequacy of the procedural protections that he was afforded during his expedited removal proceedings, as well as

Supp. 2d 457, 459 (W.D. Tex. 2011)) ("[A] reviewing court may determine whether a removal order [under § 1225(b)(1)] 'was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually admissible or entitled to any relief from removal.'"). Thus, where a plaintiff seeks review of a determination made under § 1225(b)(1) but "does not raise one of the grounds for review permitted by § 1252(e)(2), the [district] [c]ourt has no jurisdiction to consider his claims." *Rodrigues*, 2020 WL 363041, at *4 (quoting *Shah*, 2019 WL 4254139, at *2).

In his complaint, the plaintiff asserts that the court may exercise jurisdiction over his claims on several bases. Complaint at 5 (asserting that the court may exercise jurisdiction pursuant to 28 U.S.C. § 1331, the APA (5 U.S.C. § 701), the INA, 28 U.S.C. § 2241, and the Suspension Clause of the United States Constitution (U.S. Const. art. I, § 9, cl. 2)). The plaintiff also asserts that he "is not seeking to have this [c]ourt declare that he is entitled to asylum or grant him legal status," nor declare that the plaintiff is "entitled to any relief from removal." TRO at 1. Rather, the plaintiff requests that the court "order that the government provide [the plaintiff] with the full and fair opportunity to be heard that is required" by law. *Id.*

The plaintiff raises legitimate concerns about the adequacy of the procedural protections that he was afforded during his expedited removal proceedings, as well as

the validity of the (c)(4) bar under the APA.² But the fact remains that at bottom, each of the plaintiff's claims asks this court to engage in "[j]udicial review of [the] determination made under section 1225(b)(1)" that the plaintiff is subject to expedited removal. This the court cannot do. *See* 8 U.S.C. § 1252(e)(2); *Rodrigues*, 2020 WL 363041, at *4 (engaging in a thorough analysis of 8 U.S.C. § 1252, and concluding: "Because § 1252(a)(2)(A) strips courts of jurisdiction to review claims relating to the expedited removal statute except as provided in § 1252(e), '[n]otwithstanding any other provision of law (statutory or nonstatutory),'" the court lacked a basis of jurisdiction to review the plaintiff's challenge to an order of expedited removal).

2. *The Plaintiff Fails to Establish that He is Entitled to Invoke the Suspension Clause*

In addition to the statutory bases of jurisdiction on which the plaintiff relies, the plaintiff's motion also presents an undeveloped assertion that the jurisdiction-stripping provision of 8 U.S.C. § 1252(e)(2) violates the Suspension Clause of the United States Constitution, and thus, that the court may exercise jurisdiction in this case. *See* TRO at 2. The court is not persuaded.

---

² *See* TRO at 5-7 (noting communication issues between the plaintiff and the asylum officer, and asserting that the plaintiff's credible fear review before the immigration judge was cursory and lasted less than seventeen minutes). The plaintiff also cites two district court cases from the Ninth Circuit that call the validity of the (c)(4) bar into question. *Id.* at 2 (citing *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922 (N.D. Cal. 2019), order reinstated, 391 F. Supp. 3d 974 (N.D. Cal. 2019); *Al Otro Lado v. McAleenan*, 2019 WL 6134601 (S.D. Cal. Nov. 19, 2019)).

District courts have "jurisdiction to determine whether the elimination of [their] federal habeas jurisdiction violates the Suspension Clause." *Benitez-Garay v. Department of Homeland Security*, No. SA-18-CA-422-XR, 2019 WL 542035, at *7 (W.D. Tex. Feb. 8, 2019) (citing *Umuhoza v. United States Department of Homeland Security*, 3:05-CV-164, 2008 WL 11352573, at *7 (S.D. Ohio Aug. 28, 2008)). The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "The Clause mandates 'some judicial intervention in deportation cases.'" *Rodrigues*, 2020 WL 363041, at *6 (quoting *Diaz Rodriguez v. U.S. Customs & Border Protection*, No. 6:14-CV-2716, 2014 WL 4675182, at *3 (W.D. La. Sept. 18, 2014), vacated sub nom. *Diaz-Rodriguez v. Holder*, No. 14-31103, 2014 WL 10965184 (5th Cir. Dec. 16, 2014)).

"To determine whether a jurisdiction-stripping statute violates the Suspension Clause, the [c]ourt applies the two-step analysis established by *Boumediene v. Bush*, 553 U.S. 723 (2008)." *Benitez-Garay,* 2019 WL 542035, at *7. At step one, the court must determine "whether a habeas petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or to the circumstances surrounding his detention or removal." *Id.* (citing *Boumediene*, 553 U.S. at 739). If the petitioner satisfies step-one, only then does the court move to step-two to "consider whether the substitute for habeas corpus provided by the

jurisdiction-stripping statute is adequate to test the legality of the petitioner's removal." *Id.* (citing *Castro v. United States Department of Homeland Security*, 835 F.3d 422, 438 (3d Cir. 2016), *cert. denied*, 137 S. Ct. (2017)).

The parties do not cite any case in which the Fifth Circuit considered whether § 1252(e)(2), as applied to an alien petitioner in expedited removal, violates the Suspension Clause, nor is the court aware of any such case.[3] It appears that only two federal courts of appeals have considered that question: the Third Circuit and the Ninth Circuit. See *Thuraissigiam v. United States Department of Homeland Security*, 917 F.3d 1097, 1105 (9th Cir. 2019) (citing *Castro v. U.S. Department of Homeland Security*, 835 F.3d 422 (3d Cir. 2016), *cert. denied*, ___U.S.___, 137 S.Ct. 1581 (2017)) ("Of the federal courts of appeals, only the Third Circuit has addressed . . . whether § 1252(e)(2) as applied to noncitizen petitioners in expedited removal

---

[3] The Government points to *Brumme v. I.N.S.*, 275 F.3d 443 (5th Cir. 2001), in support of its argument that "the Suspension Clause does not supply jurisdiction for claims like Nianga's." Response at 17. In *Brumme*, however, the petitioner did not raise a Suspension Clause challenge on appeal. Rather, the petitioner argued that "the *plain language* of 8 U.S.C. § 1252(e)(2) . . . 'permits the court to review whether [§ 1225(b)(1)] was applicable in the first place'". *Brumme*, 275 F.3d at 447-48 (emphasis added) (brackets in *Brumme*). Thus, although the *Brumme* court concluded that the plain language of 8 U.S.C. § 1252(e)(2) operates to "limit the scope of review in a habeas proceeding involving determinations made under § 1225(b)(1)," the court did not consider whether 8 U.S.C. § 1252(e)(2) offends the Suspension Clause. *See id.* at 448 (emphasis omitted). Furthermore, *Brumme* was decided well before the Supreme Court clarified the test for analyzing Suspension Clause challenges in *Boumediene*. The court therefore finds *Brumme* inapposite to the Suspension Clause analysis in this case.

violates the Suspension Clause."). In *Thuraissigiam*, the Ninth Circuit parted ways with the Third Circuit's reading of *Boumediene* in *Castro*, and held that the petitioner satisfied step one of the *Boumediene* analysis. See *Thuraissigiam*, 917 F.3d at 1115 (concluding that non-citizen petitioner in expedited removal proceedings could invoke the Suspension Clause based on line of cases in which "the [Supreme] Court permitted even arriving noncitizens to invoke habeas review"); cf. *Castro*, 835 F.3d at 445 (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)) (holding that the petitioners failed to "clear *Boumediene*'s first hurdle" based on *Landon*'s conclusion "that 'an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.'").

Here, the plaintiff's treatment of the Suspension Clause comprises one sentence of his motion and merely references the Ninth Circuit's holding in *Thuraissigiam* and the fact that *Thuraissigiam* is currently pending before the Supreme Court. See TRO at 2; *Thuraissigiam v. United States Department of Homeland Security*, 917 F.3d 1097 (9th Cir.), *cert. granted sub nom*. *Department of Homeland Security v. Thuraissigiam*, ___U.S.___ 140 S. Ct. 427 (2019). While the court notes that the Ninth Circuit's opinion in *Thuraissigiam* would support the plaintiff's position were it binding precedent, at least two district courts in the Fifth Circuit have expressly adopted *Castro*'s contrary approach to step-one of the *Boumediene* analysis. See *Bansci v. Nielsen*, 321 F. Supp. 3d 729, 737 (W.D. Tex. 2018); *Hidalgo-Mejia v. Pitts*, 343 F.

Supp. 3d 667, 671-72 (W.D. Tex. 2018).  In both cases, the court relied on *Castro* and concluded that the petitioners' Suspension Clause challenges to 8 U.S.C. § 1252(e)(2) failed step-one of the *Boumediene* analysis because the petitioners were "detained at the border", *Bansci*, 321 F. Supp. at 737, or "detained within days after entering the United States", *Hidalgo-Mejia*, 343 F. Supp. at 672.  Cf. *Castro*, 835 F.3d at 446 (distinguishing the constitutional protections afforded to "recent clandestine entrants" from those afforded to lawful permanent residents).

In the present case, because Nianga was admittedly detained upon his entry to the United States on September 15, 2019 and placed into expedited removal proceedings shortly thereafter, and because Nianga leaves his Suspension Clause challenge undeveloped, the court concludes that Nianga has failed to satisfy *Boumediene*'s first hurdle.  See *Hidalgo-Mejia*, 343 F. Supp. at 672 ("Petitioner, who has the burden of establishing jurisdiction, makes no attempt to overcome *Boumediene*'s first hurdle.");  see also *Rodrigues*, 2020 WL 363041, at *6 (rejecting the plaintiff's similarly undeveloped Suspension Clause challenge to § 1252(e)(2) in part because the plaintiff "only tangentially [raised] a Suspension Clause argument").  The court therefore concludes that the plaintiff has failed to establish that he is entitled to raise a Suspension Clause challenge to § 1252(e)(2) in this case.

III. CONCLUSION

In light of the foregoing, the court concludes that the court lacks jurisdiction to adjudicate Nianga's claims. The court therefore **DENIES** the plaintiff's motion for a TRO, and **DISMISSES** this action for lack of subject matter jurisdiction.[4]

**SO ORDERED**.

January 27, 2020.

*A. Joe Fish*
A. JOE FISH
Senior United States District Judge

---

[4] The court notes the harsh impact that the timing of 8 C.F.R. § 208.13(c)(4)'s promulgation and the litigation regarding the enforceability of the (c)(4) bar worked on Nianga's attempt to obtain asylum. Nianga first sought entry to and asylum in the U.S. in or around April of 2019. Complaint at 16. Nianga alleges that he was denied entry to the U.S. in April 2019 under an unlawful "metering" policy. *Id.* Months later, on July 16, 2019, the (c)(4) bar became effective. *See* 8 C.F.R. § 208.13(c)(4). Then, on July 24, 2019, the (c)(4) bar became subject to a nationwide injunction under which the government was enjoined from "taking any action continuing to implement the [(c)(4) bar]" and ordered "to return to the pre-[(c)(4) bar] practices for processing asylum applications." *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 960 (N.D. Cal.), *order reinstated*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). The Supreme Court eventually issued a stay of the nationwide injunction on September 11, 2019, "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is sought." *Barr v. East Bay Sanctuary Covenant*, ___ U.S. ___, 140 S. Ct. 3 (2019) (mem.). On September 15, 2019, four days after the Supreme Court issued the stay, Nianga once again sought asylum in the U.S., but was ultimately denied asylum pursuant to the (c)(4) bar. Although the court lacks jurisdiction to determine the legality of the "metering" policy to which Nianga was subjected, the court is sympathetic to the fact that had Nianga been allowed to apply for asylum in April of 2019, he would not have been subject to the (c)(4) bar. Despite this harsh result, the court nonetheless lacks jurisdiction to grant Nianga the relief that he seeks.